R.C.A. COMMUNICATIONS, INC., ET AL., Plaintiffs and Appellees, *v.* GOVERNMENT OF THE CAPITAL, Defendant and Appellant.

No. CE-63-4. Decided November 17, 1964.

406

*Adelaida Vicente de Souffront, Gerardo Muñoz Dones, Alberto Picó,* and *Francisco A. Rosa Silva* for appellant. *Fiddler, González & Rodríguez, María Luisa Fuster,* and *Manuel Hernández Penzol* for appellees. *J. B. Fernández Badillo, Solicitor General,* and *Irene Curbelo, Assistant Solicitor General,* for the Commonwealth of Puerto Rico.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

In complaints filed in the San Juan Part of the District Court against the Municipality of San Juan, the corporations R.C.A. Communications, Inc., and Cable & Wireless (West Indies), Limited, sought the refund of amounts paid for license taxes in 1960 and 1961. They alleged that the collection of license taxes was illegal since plaintiffs were doing business in interstate commerce and their activites were regulated by federal legislation. That the tax levied on them for licenses was an undue intervention on the part of the Municipality of San Juan in the interstate commerce of the United States, and constituted an obstacle to such commerce.

The San Juan Part of the District Court rejected plaintiffs' contention, upheld the validity of the tax, and dismissed the complaints. Another attack on the power of the Municipality of San Juan to impose the license taxes in litigation, based on the application of the license tax statute, was also dismissed by the District Court, and actually it is not now under our consideration. If it were, as a problem of internal law we would hold that the Municipality of San Juan was duly authorized by the Legislative Assembly of the Commonwealth of Puerto Rico to levy and collect such taxes.

On appeal, the San Juan Part of the Superior Court reversed the judgments of the District Court. It based its judgment for reversal on the following considerations which we copy:

"There is no controversy as to the facts. Plaintiffs paid under protest the amount of the license tax which they now claim. They are engaged exclusively in communications between the States and foreign countries.

"The power to levy municipal license taxes appears from 21 L.P.R.A. §§ 621–40, 1173, and 1479. That statute is not repugnant to Art. I, § 8, Clause 3, of the Constitution of the United States, 27 P.R.R. 567. The Federal Relations Act authorizes the levy of taxes on property, income, internal revenue, and on licenses, franchises, privileges, and concessions for the purposes of the insular and municipal governments, respectively, as provided and defined by the Legislature of Puerto Rico, § 3, L.P.R.A., vol. 1, p. 158.

"In order to decide whether the imposition of license taxes is applicable to plaintiffs, it is necessary to determine the essential nature of the commerce to be protected taking into consideration the type of business. 22 P.R.R. 108, 19 P.R.R. 679, 27 P.R.R. 569, and 28 P.R.R. 856.

"The wireless and radio communications business of plaintiffs is essentially between the States and foreign countries, and a license tax as a condition precedent for engaging in such business has been interpreted as intervening in interstate commerce.

"The judgments of the District Court are reversed and the complaints are in turn sustained, and the Government of the Capital is hereby ordered to refund and pay to plaintiffs the following amounts of money: [amounts follow]."

The Municipality levied and collected the license taxes in question in the exercise of a power vested by an Act of the Legislative Assembly. Under those circumstances, and the parties so recognize, plaintiffs' challenge constitutes an attack on the taxing power of the Commonwealth of Puerto Rico, according to their contentions. They have therefore argued in their briefs the public and governmental power of

the Commonwealth of Puerto Rico to levy taxes, in view of the nature of the attack herein made.

By Act No. 600 of July 3, 1950, an Act to provide for the organization of a constitutional government by the people of Puerto Rico, 64 Stat. 314, the Congress of the United States stated that[1] in full recognition of the principle of government by consent of those governed, it adopted that Act in the nature of a compact so that the people of Puerto Rico may organize a government pursuant to a constitution of their own adoption. It was provided that Act No. 600 would be submitted to a referendum for acceptance or rejection by the Puerto Ricans, and upon approval by a majority of the qualified voters participating therein, the Legislature of Puerto Rico was authorized to call a constitutional convention to draft a constitution for the Island of Puerto Rico. One requirement was that the Constitution shall provide a republican form of government and shall include a bill of rights. Upon adoption of the Constitution by the people of Puerto Rico, the President of the United States was authorized to transmit the same to the Congress if he found that such Constitution conformed with the applicable provisions of Act No. 600 and of the Constitution of the United States. Upon approval by the Congress, the Constitution would become effective in accordance with its terms. At such time, only some of the provisions of the former territorial Organic Act of 1917 which were identified in that Act would remain in force, and subsist as the Puerto Rican Federal Relations Act.

All of the foregoing took place. By referendum the qualified voters of Puerto Rico accepted Act No. 600 on June 4, 1951. The Constitution adopted by a constitutional conven-

---

[1] The Spanish version follows the translation made by the Legislative Assembly of Puerto Rico.

tion was also adopted by the people at an election held on March 3, 1952.

There are two resolutions of the Constitutional Convention, Nos. 22 and 23, both of which were adopted at the plenary session of February 4, 1952, which deserve mention. Resolution No. 22 stated that in accordance with the mandate received from the people, a Constitution was about to be adopted by virtue of which the Puerto Rican community would be politically organized; that it was necessary to give an appropriate name in both English and Spanish to the body politic thus created; that the word *"commonwealth"* in contemporary English usage means a politically organized community, in the generic sense, a state, in which the public power resides ultimately in the people, hence a free state, but one which is at the same time linked to a broader political system in a federal or other type of association, and therefore does not have an independent and separate existence; that the word *"commonwealth"* *clearly defined* the *"status"* of the body politic created under the terms of the compact existing between the people of Puerto Rico and the United States, *i.e.*, a state which is free of superior authority in the management of its own local affairs but which is linked to the United States of America and hence was a part of its political system in a manner compatible with its federal structure; that the translation into Spanish of the English word *"commonwealth"* required a combination of words to express the concepts of state and liberty and association; that expression was *"estado libre asociado"*; that in the case of Puerto Rico the most appropriate translation of *"commonwealth"* was *"estado libre asociado,"* but the literal translation from the Spanish as *"associated free state"* was not proper because *"state"* meant in the United States one of the states of the Union; that the body politic created by the Constitution shall be designated *"The Commonwealth of Puerto Rico"* in English and *"Estado Libre Asociado de*

*Puerto Rico*" in Spanish; and it was provided that the text of that resolution shall be widely distributed, together with the Constitution, for the information of the people of Puerto Rico and the Congress of the United States.

Resolution No. 23 set forth that the Constitutional Convention, in fulfilling the mission assigned to it by the people, had approved a Constitution for the Commonwealth of Puerto Rico within the terms of the compact entered into with the United States of America; that in accordance with the terms of the compact, the said Constitution was to be submitted to the people of Puerto Rico for their approval; and it was provided that the following *final declarations* of the Convention, among others, be entered on its journal and published: (b) when this Constitution takes effect, the people of Puerto Rico shall thereupon be organized in a commonwealth established within the terms of the compact entered into by mutual consent, which is the basis of our union with the United States of America; (c) that the political authority of the Commonwealth of Puerto Rico shall be exercised in accordance with its Constitution and within the terms of said compact; (d) that thus we attain the goal of complete self-government, the last vestiges of colonialism having disappeared in the principle of compact; nothing could surpass in political dignity the principles of mutual consent and of compacts freely agreed upon; having full political dignity, the Commonwealth of Puerto Rico may develop in other ways by modifications of the compact through mutual consent; (e) that the people of Puerto Rico reserved the right to propose and to accept modifications in the terms of its relations with the United States of America, in order that these relations may at all times be the expression of a compact freely entered into between the people of Puerto Rico and the United States of America. It was expressly provided that a copy of this Resolution No. 23 be sent to the President of the United States, to the President of the Senate, and the

Speaker of the House of Representatives of the United States.

In the preamble of the Constitution adopted, the people of Puerto Rico stated that, in order to organize themselves politically on a fully democratic basis, they established that Constitution for the Commonwealth which, in the exercise of their natural rights, they now created within their union with the United States of America; and the people of Puerto Rico *declared*, among other things: that they understood that the democratic system of government is one in which the will of the people is the source of public power; that they considered as determining factors in their life their citizenship of the United States of America, and their aspiration to enrich their democratic heritage in the individual and collective enjoyment of their rights and privileges; also, the loyalty to the principles of the Federal Constitution.

■ The Constitution having been already adopted by the people of Puerto Rico, by Joint Resolution of July 3, 1952 —Act No. 447, 66 Stat. 327—a subsequent Congress reaffirmed that Act No. 600, "An Act to provide for the organization of a constitutional government by the people of Puerto Rico," had been adopted by Congress in the nature of a compact with the people of Puerto Rico, to become operative upon its approval by the people of Puerto Rico.[2] Setting forth that the people of Puerto Rico had overwhelmingly approved Act No. 600 *supra*, and also had adopted a Constitution conforming fully with the applicable provisions of that Act and of the Constitution of the United States, that it contained a bill of rights, and provided for a republican

---

[2] Act No. 600, 64 Stat. 319, provided according to its original text: ". . . this Act is now adopted *in the nature of a compact so that* the people of Puerto Rico may organize a government pursuant to a constitution of their own adoption." Act No. 447—subsequent to Act No. 600, 66 Stat. 327, stated that Act No. 600 had been adopted by Congress "*as a compact with* the people of Puerto Rico," to become operative upon its approval by the people of Puerto Rico. At the end of this statute reference is again made to Act No. 600, "*in the nature of a compact.*"

form of government, Congress approved the Constitution of the Commonwealth.[3]

When in the discharge of responsibilities under Art. IX of the Treaty of Paris—"The civil rights and political status of the native inhabitants of the territories hereby ceded to the United States shall be determined by the Congress"— and in the discharge of responsibilities under the Constitution of the United States, Art. IV, § 3—"The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States"*—*De Lima* v. *Bidwell*, 182 U.S. 1; *Downes* v. *Bidwell*, 182 U.S. 244—Congress enacted Act No. 600 in the terms in which it did, the Puerto Ricans had the prerogative of accepting or rejecting the action of Congress. If it had not been accepted, the subsequent events which culminated in the organization of the Puerto Rican community as a body politic which it chose to organize itself under the terms of its own Constitution would not have taken place.

When in the discharge of those responsibilities Congress approved the Constitution adopted by the Puerto Ricans upon organizing themselves as a body politic, several facts became evident:

(1) Congress did not simply have under its consideration the nine articles and their respective subdivisions of which

---

[3] With the exception of § 20 of Art. II, and subject to the amendments to §§ 5 of Art. II and 3 of Art. VII. The amendments went into effect on January 29, 1953. The amendment to § 3 of Art. VII, as textually required by Congress and accepted by the people of Puerto Rico, provides: "Any amendment or revision of this Constitution shall be consistent with the resolution enacted by the Congress of the United States approving this Constitution, with the applicable provisions of the Constitution of the United States, with the Puerto Rican Federal Relations Act, and with Public Law 600, of the Eighty-first Congress, adopted in the nature of a compact."

* Editor's Note: We omit this footnote as the English text of the citation is made part of the body of the opinion.

the Constitution consists. It also had under consideration and knew the political expressions of the people of Puerto Rico defining the political status created, contained in Resolutions Nos. 22 and 23 of the Constitutional Convention and in the Preamble of the Constitution.

(2) With full knowledge of those facts and of the political thinking of the people of Puerto Rico as expressed throughout those events, the Congress of the United States determined that that Constitution was not inconsistent with the applicable provisions of Act No. 600 and of the Constitution of the United States, and that it had provided for a republican form of government.

(3) In the discharge of the responsibility toward the Puerto Ricans under § 3, Art. IV of the Constitution and the Treaty of Paris, particularly respecting the protection of those basic liberties and private rights guaranteed by the Constitution of the United States which, even though Puerto Rico was not a state nor an incorporated territory, the Congress was bound to safeguard, whether acting directly or through delegation in a territorial local government—*De Lima* v. *Bidwell*; *Downes* v. *Bidwell, supra*; *Balzac* v. *Porto Rico*, 258 U.S. 298, 312–13—Congress also determined that the Constitution of the Commonwealth contained a Bill of Rights for the protection of the inhabitants of Puerto Rico against what might be government action violative of those basic fundamental liberties and personal guarantees, which Congress found satisfactory. In fact, viewed in the image of the Constitution of the United States and other universal documents guaranteeing the rights of the human being, the Bill of Rights of the Constitution of the Commonwealth which was adopted by the Puerto Ricans for the first time in their history when they organized themselves as a body politic with its own government, is something of which our people ought to be proud.

(4) In accepting as satisfactory the Bill of Rights of

the Constitution, Congress was to presume—and in fact it is so and ought to be—that the public powers and the courts of the Commonwealth shall render effective and construe the provisions of that Bill of Rights in a manner consistent with the protection afforded to those fundamental liberties and personal guarantees by the same or similar provisions of the Constitution of the United States, and not in a smaller degree of protection, as these are or be construed and applied by the Supreme Court of the United States, both because we are a community bearing the citizenship of the United States and because the Puerto Rican people expressed their loyalty to the principles of the Constitution of the United States in the Preamble of the Constitution which they adopted as one of the determining factors of their life as a people.[4]

From those evident facts in which the leading parts were played by the people of the United States, through its Congress and maximum exponent, and the Puerto Rican community, directly through its qualified inhabitants, and by virtue of the clear and simple expressions of those people contained in the various documents which perpetrated the political events which took place, it is clear in law that, unlike the territorial systems of the Foraker Act and the Organic Act of 1917 consisting of authority and powers merely delegated by Congress and subject to its supervision, the public and governmental powers of the Commonwealth of Puerto Rico within its exclusive authority, the most fundamental of which is to levy tax in common essence with its creation as a body politic and essential to its subsistence and its survival as a state, flow from itself and from its own authority and it being exclusive as respects its taxing power,

---

[4] The final judgments of the Supreme Court of the Commonwealth of Puerto Rico may be reviewed by the Supreme Court of The United States to the same extent as it is permissible to review the final judgments of the states of the Union. Act No. 87–189 of August 30, 1961, 75 Stat. 417; and see 28 U.S.C.A. § 1257. See Rule 62 of the Supreme Court of the United States added on May 30, 1963.

it exercises this power free of any higher authority, subject only to the limitations of its own Constitution and its Bill of Rights, which Congress already determined was not inconsistent with the applicable provisions of the Constitution of the United States, and with those obligations which the people imposed on itself in accepting the federal relations which were to exist and do exist with the United States pursuant to Act No. 600. It is true that there is still in § 3 of the Federal Relations Act a residual expression that taxes and assessments may be imposed on property . . . for the purposes of the insular and municipal governments.[5] However, the fundamental taxing power of the Commonwealth does not rest or depend any longer on that expression characteristic of a former time when authority was delegated.[6] It is there because originally it was part of § 3 of the Organic Act of 1917, which section was from the very beginning essentially a regulation of relations with the United States respecting the imposition of taxes, and still is essentially under the Federal Relations Act, for which reason it subsisted, particularly since the provisions on debt-incurring capacity were eliminated from § 3 by Act No. 87–121 of August 3, 1961, 75 Stat. 245.[7]

---

[5] In *P.R. Telephone Co.* v. *Tax Ct.; Sec. of the Treas., Int.*, 81 P.R.R. 948 (1960), we said that this was equivalent to the phrase "for a public purpose."

[6] *Cf. Rivera* v. *District Court*, 62 P.R.R. 491 (1943).

[7] In order not to elaborate further on these provisions, it is well to point out that provision of the Foraker Act, § 31, 31 Stat. 83: "That all laws enacted by the Legislative Assembly shall be reported to the Congress of the United States, which hereby reserves the power and authority, if deemed advisable, to annul the same," and a similar one of the Organic Act of 1917, § 34, 39 Stat. 960, "All laws enacted by the Legislative Assembly of Puerto Rico shall be reported to the Congress of the United States . . . which hereby reserves the power and authority to annul the same," for the purpose of dramatizing the nature essentially of powers delegated by those laws and the immediate supervision of Congress of the exercise of the delegation of authority, which provisions remained in force, except for a brief period when they disappeared in 1928 and were promptly

██ The tax in litigation in this case, imposed by virtue of an Act of the Legislative Assembly of Puerto Rico, is not inconsistent with any provision of the Constitution of the Commonwealth. If there were any legal impediment to sustain it, it would be necessary to find it in some provision, or as a result of some provision of the Federal Relations Act. The limitations on its taxing power which the people of Puerto Rico accepted by this Act are not involved in this litigation. Those express limitations are that no duties shall be levied or collected on exports from Puerto Rico, and that in levying internal-revenue taxes on articles, goods, wares, or merchandise, the Commonwealth shall make no discrimination between articles imported from the United States or foreign countries and similar articles produced or manufactured in Puerto Rico. Also, Puerto Rico is under the duty to respect the rights, privileges, and immunities of citizens of the United States to the same extent as the citizens of each state enjoy all the privileges and immunities of the citizens in different states, under paragraph 1, § 2, Art. IV of the Federal Constitution. Federal Relations Act, §§ 2 and 3. See, also, *Postley* v. *Secretary of the Treasury*, 75 P.R.R. 822 (1954).

There remains to consider next whether the tax challenged is in conflict with or should yield to any statutory law of the United States not locally inapplicable having the same effect and validity in Puerto Rico as in the United States—Federal Relations Act, § 9—or is in conflict with or should yield to laws or parts of laws applicable to Puerto Rico at the time the Commonwealth was created, which the people of Puerto Rico accepted to continue in force pursuant to § 58 of the Federal Relations Act. The tax in litigation is challenged because, according to plaintiffs, it interferes

reinstated, until the Commonwealth arose despite the liberal thinking of *Puerto Rico* v. *Shell Co.*, 302 U.S. 253 (1937), and other judgments of the Supreme Court of the United States.

with the regulation of interstate commerce reserved to Congress, and because the tax stands in the way of such commerce. Let us see.

It is a historical fact that the Constitution of the United States on its face and by its own force was not extended to the inhabitants of Puerto Rico because of the fact itself of the cession in the Treaty of Paris. It is a historical fact that the Congress of the United States, in the exercise of its authority under subd. 2, § 3, Art. IV of the Constitution, did not extend from the beginning, nor has extended directly to Puerto Rico, the provisions of the Constitution, as in the case of other communities, with the exception of the action taken in 1947 by Act No. 362, 61 Stat. 770, in which it treated Puerto Rico as if it were a state of the Union for the purpose of here rendering effective subd. 1, § 2, Art. IV, respecting the privileges and immunities of the citizens of the states in different states. Another historical fact is that the constitutional provision which reserves to Congress the power to regulate commerce with foreign nations, between the states and with the Indian tribes, has not only not governed, nor governs, by its own force in Puerto Rico, but, on the contrary, Congress expressly provided that neither the Interstate Commerce Act and the several amendments made or to be made thereto . . . nor an Act to regulate commerce of February 4, 1887, and the Acts amendatory thereof, according to § 38 of the Organic Act of 1917, 39 Stat. 964, and which are still in force as part of the Federal Relations Act, shall apply to Puerto Rico. Lastly, it is a historical fact that by express mandate of Congress from the beginning the internal-revenue laws of the United States did not have, nor have, force or validity in Puerto Rico. Section 14 of the Foraker Act, 31 Stat. 80; § 9 of the Federal Relations Act, 39 Stat. 954.[8]

---

[8] In this connection, see Act No. 3 of May 6, 1959 (Sess. Laws, p. 13) and Joint Resolution No. 97 of June 22, 1956, whereby the Commonwealth

■ ■ Naturally, in the past, as at present, there has been interstate commerce relation between Puerto Rico and the United States, but that relation existed by express provisions of Congress in the exercise of its authority under subd. 2, § 3, Art. IV of the Federal Constitution and at present under Act No. 600. This interstate commerce relation has constitutionally had, and still has, contours which are different from the relation which under the Constitution prevails among the states of the Union. That is why even under the former systems Puerto Rico was able to exercise the taxing power, and the Commonwealth may exercise that power at present respecting interstate commerce in a manner that perhaps it would not be permissible to a state covered by the provisions of the Federal Constitution.[9]

The license taxes in litigation were imposed by virtue of Act No. 26 of March 28, 1914, as amended, 21 L.P.R.A. §§ 621–40, and of Ordinance No. 46, 1959–60 series, of the Municipality of San Juan. This ordinance subjects to the payment of license tax a business or enterprise engaged in (11) "Communications by wire or teletype, or radiotelephony or radiotelegraphy, or teletype, or the like." The taxes were collected pursuant to § 3 of the License Tax Act on the basis of the volume of business transacted during the calen-

---

of Puerto Rico granted its consent to continue in force in Puerto Rico certain provisions of the Federal Internal Revenue Code, and to collect in Puerto Rico a federal tax on the processing of refined sugar. Also, Joint Resolution No. 1 of July 25, 1956.

[9] *De Lima* v. *Bidwell*; *Downes* v. *Bidwell, supra*; *Dooley* v. *United States*, 182 U.S. 222, 183 U.S. 151; *West India Oil Co.* v. *Domenech*, 311 U.S. 20; *Lugo* v. *Suazo*, 59 F.2d 386 (1st Cir.); *Sancho* v. *Bacardi Corporation of America*, 109 F.2d 57 (1st Cir.); *Buscaglia* v. *Ballester*, 162 F.2d 805 (1st Cir.), cert. denied, 332 U.S. 816; *Texas Co. (P.R.), Inc.* v. *Tax Court; Descartes, Int.*, 82 P.R.R. 129 (Hernández Matos) (1961), affirmed under the name of *Texaco Puerto Rico, Inc.* v. *Descartes*, 304 F.2d 184 (1st Cir.), cert. denied, 372 U.S. 907. See: *Inter Island Shipping Corporation* v. *Industrial Commission,* 89 P.R.R. 635 (Belaval) (1963); *Fonseca* v. *Prann*, 282 F.2d 153 (1st Cir.), cert. denied, 365 U.S. 860; *Miranda* v. *People of P.R.*, 101 F.2d 26 (1st Cir.), on customs duties.

dar year immediately preceding. The Act defines volume of business in § 4 thereof as the *gross receipts* in any municipality of the business or industry, from its business transactions in Puerto Rico, its gains or profits not alone to be considered; . . . where stores, business houses or other industries are concerned, the amount of sales; in the case of telephone or electric service, the amount of fees collected; and in general, the amount of receipts from any business transacted or service rendered, in accordance with the nature of the business or industry.

▮ Knowing the nature of the tax in litigation, we must say that even though the Commonwealth's taxing power and the taxes in litigation were situated in the constitutional orbit of the States themselves respecting interstate commerce—and we see that such taxing power is not thus limited—still the validity of plaintiffs' contention to the effect that the imposition and collection of these license taxes interferes with the regulation of interstate commerce and operates as an obstacle, would be quite precarious in the light of known cases of the Supreme Court of the United States which we need not discuss here at length in view of the affirmance in *General Motors Corp.* v. *Washington,* 377 U.S. 436, decided June 8, 1964, to which we refer by way of illustration.

In a situation similar to ours, the tax in the *Washington* case was measured by the *gross* wholesale *sales* by General Motors of motor vehicles, parts and accessories delivered in the State of Washington. It was claimed that the tax on unapportioned gross receipts was a tax on the privilege of engaging in interstate commerce, inherently discriminatory, and which resulted in the imposition of a multiple tax burden and a deprivation of property without due process of law. The Supreme Court of Washington upheld the tax, and the Supreme Court of the United States affirmed. The Court, speaking through Mr. Justice Clark, said:

"We start with the proposition that '[i]t was not the purpose of the commerce clause to relieve those engaged in interstate commerce from their just share of state tax burden even though it increases the cost of doing the business.' *Western Live Stock* v. *Bureau of Revenue,* 303 U.S. 250, 254 (1938). 'Even interstate business must pay its way,' *Postal Telegraph-Cable Co.* v. *Richmond,* 249 U.S. 252, 259 (1919), as is evidenced by numerous opinions of this Court. For example, the Court has approved property taxes on the instruments employed in commerce, *Western Union Telegraph Co.* v. *Attorney General,* 125 U.S. 530 (1888); on property devoted to interstate transportation fairly apportioned to its use within the State, *Pullman's Palace Car Co.* v. *Pennsylvania,* 141 U.S. 18 (1891); on profits derived from foreign or interstate commerce by way of a net income tax, *William E. Peck & Co.* v. *Lowe,* 247 U.S. 165 (1918), and *United States Glue Co.* v. *Oak Creek,* 247 U.S. 321 (1918); by franchise taxes, measured by the net income of a commercially domiciled corporation from interstate commerce attributable to business done in the State and fairly apportioned, *Underwood Typewriter Co.* v. *Chamberlain,* 254 U.S. 113 (1920); by a franchise tax measured on a proportional formula on profits of a unitary business manufacturing and selling ale, 'the process of manufacturing resulting in no profits until it ends in sales,' *Bass, Ratcliff & Gretton, Ltd.* v. *State Tax Comm'n,* 266 U.S. 271, 282 (1924); by a personal property tax by a domiciliary State on a fleet of airplanes whose home port was in the taxing State, despite the fact that personal property taxes were paid on part of the fleet in other States, *Northwest Airlines, Inc.* v. *Minnesota,* 322 U.S. 292 (1944); by a net income tax on revenues derived from interstate commerce where fairly apportioned to business activities within the State, *Northwestern States Portland Cement Co.* v. *Minnesota,* 358 U.S. 450 (1959); and by a franchise tax levied on an express company, in lieu of taxes upon intangible or rolling stock, measured by gross receipts, fairly apportioned, and derived from transportation within the State, *Railway Express Agency, Inc.* v. *Virginia,* 358 U.S. 434 (1959).

"However, local taxes measured by gross receipts from interstate commerce have not always fared as well. Because every State has equal rights when taxing the commerce it touches, there exists the danger that such taxes can impose cumulative

burdens upon interstate transactions which are not presented to local commerce. *Cf. Michigan-Wisconsin Pipe Line Co.* v. *Calvert,* 347 U.S. 157, 170 (1954); *Philadelphia & Southern S.S. Co.* v. *Pennsylvania,* 122 U.S. 326, 346 (1887). Such burdens would destroy interstate commerce and encourage the re-erection of those trade barriers which made the Commerce Clause necessary. *Cf. Baldwin* v. *G.A.F. Seelig, Inc.,* 294 U.S. 511, 521–522 (1935). And in this connection, we have specifically held that interstate commerce cannot be subjected to the burden of 'multiple taxation.' *Michigan-Wisconsin Pipe Line Co.* v. *Calvert, supra,* at 170. Nevertheless, as we have seen, it is well established that taxation measured by gross receipts is constitutionally proper if it is fairly apportioned.

"A careful analysis of the cases in this field teaches that the validity of the tax rests upon whether the State is exacting a constitutionally fair demand for that aspect of interstate commerce to which it bears a special relation. For our purposes the decisive issue turns on the operating incidence of the tax. In other words, the question is whether the State has exerted its power in proper proportion to appellant's activities within the state and to appellant's consequent enjoyment of the opportunities and protections which the State has afforded. Where, as in the instant case, the taxing State is not the domiciliary State, we look to the taxpayer's business activities within the State, *i.e.,* the local incidents, to determine if the gross receipts from sales therein may be fairly related to those activities. As was said in *Wisconsin* v. *J. C. Penney Co.,* 311 U.S. 435, 444 (1940), '[t]he simple but controlling question is whether the state has given anything for which it can ask return.'

" . . . . . . .

" '[I]t is beyond dispute,' we said in *Northwestern States Portland Cement Co.* v. *Minnesota, supra,* at 458, 'that a State may not lay a tax on the "privilege" of engaging in interstate commerce.' But that is not this case. To so contend here is to overlook a long line of cases of this Court holding that an in-state activity may be a sufficient local incident upon which a tax may be based. As was said in *Spector Motor Service, Inc.* v. *O'Connor,* 340 U.S. 602, 609 (1951), '[t]he State is not precluded from imposing taxes upon other activities or aspects of this [interstate] business which, unlike the privilege of doing

interstate business, are subject to the sovereign power of the State.' This is exactly what Washington seeks to do here and we cannot say that appellant has shown that its activities within the State are not such incidents as the State can reach. *Norton Co.* v. *Department of Revenue, supra,* at 537."

Lastly, the Court concludes:

"A more difficult question might arise from appellant's claim of multiple taxation. *Gwin, White & Prince, Inc.* v. *Henneford,* 305 U.S. 434, 440 (1939). General Motors claims that some of its products taxed by Washington are manufactured in St. Louis where a license tax, measured by sales before shipment, is levied. See *American Mfg. Co.* v. *St. Louis,* 250 U.S. 459 (1919). It is also urged that General Motors' Oregon-based activity which concerns Washington sales might afford sufficient incidents for a similar tax by Oregon. The Court touched upon the problem of multiple taxation in *Northwest Airlines* v. *Minnesota, supra,* at 295, but laid it to one side as 'not now before us.' Thereafter, in *Northwestern States Portland Cement Co.* v. *Minnesota, supra,* at 463, we held that '[i]n this type of case the taxpayers must show that the formula places a burden upon interstate commerce in a constitutional sense.' Appellant has not done this. . . . In such cases we have refrained from passing on the question of 'multiple taxation,' *e.g., Northwestern States Portland Cement Co.* v. *Minnesota, supra,* and we adhere to that position."

Assuming that the Commonwealth is in the same constitutional position as the states of the Union respecting interstate commerce, it seems to us that there is sufficient basis, in the light of the preceding decision and of other decisions of the Supreme Court, to uphold the validity of the tax challenged herein.

However, rather than the general attack of plaintiffs that this is an illegal tax on interstate commerce and an obstacle thereto, the question actually involved in this case seems to be another.

Plaintiffs are private business enterprises engaged in gainful purposes. However, in view of the nature of their

activities they are subject to regulation by the United States Government under the "Communications Act of 1934"—48 Stat. 1064, 47 U.S.C.A. § 151 *et seq.* Section 151 of the Communications Act of 1934, which contains a declaration of policy made by Congress, states that for the purpose of regulating interstate and foreign commerce in communications by wire and radio so as to make available, so far as possible, to all the people of the United States a rapid, efficient, nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of the national defense, for the purpose of promoting safety of life and property through the use of wire and radio communication, and for the purpose of securing a more effective execution of this policy by centralizing authority heretofore granted by law to several agencies and by granting additional authority with respect to interstate and foreign commerce in wire and radio communication, there is created a commission to be known as the "Federal Communications Commission," which shall execute and enforce the provisions of that Act.

This Act governed in Puerto Rico at the time the Commonwealth emerged and at the time Act No. 600 was accepted as relations statute, and its provisions regulated the operations of enterprises in Puerto Rico engaged in that communication activity. According to § 9 of the Federal Relations Act in force on July 25, 1952, 39 Stat. 954, the statutory laws of the United States not *locally inapplicable* shall have the same force and effect in Puerto Rico as in the United States; and according to § 58 of the Federal Relations Act, 39 Stat. 968, the laws applicable to Puerto Rico at the time the Federal Relations Act was accepted and which were not in conflict therewith would remain in force.

 In view of the purposes and aims of the Communications Act of 1934—the national defense of the United States inclusive—of nation-wide and world-wide interest, we

need not argue that the Communications Act of 1934 in effect at the time of accepting Act No. 600 is not one of the laws *locally inapplicable*, pursuant to § 9 *supra* of the Federal Relations Act, nor would it be in conflict therewith pursuant to § 58.

In § 201 *et seq.* of the Communications Act of 1934, plaintiffs are classed as common carriers. Their services, practices, classifications, technical and commercial operations and other activities, as well as their schedules and charges, are fully regulated by the federal authority. It is their duty to offer those services and collect those charges which may be fair and reasonable, and any such charge which is unfair and unreasonable is declared to be unlawful by the Act; and they are bound—§ 203—to file with the Federal Communications Commission, and keep open for public inspection, their schedules and charges, which may be investigated and annulled if found to be a violation of the Act or are not reasonable and fair. Notwithstanding the detailed regulation of their activities, services and business, plaintiffs do not need federal authorization, through a license, to engage in that aspect of interstate commerce, unlike radio broadcasting stations which by express provision of the Act are not considered common carriers—§ 153 (h)—and which need such authorization or license to be able to engage in their activities—§ 301.

The Communications Act of 1934 does not impose on plaintiffs and on their activities or business any tax or assessment, nor particularly by way of *license*, whether for the purposes of regulation or for raising federal revenues. On the other hand, the License Tax Act of Puerto Rico does not impose on plaintiffs nor on any business or commercial activity covered thereunder a license tax as a prerequisite of regulation, or as a permit or authorization to engage in their activities. The trial court's conclusion that the license tax involved here was a prerequisite in order that plaintiffs

could engage in their activities, the impression being that it is a license issued by the Commonwealth to engage in that interstate commerce, was an erroneous construction of our license tax statute. The purpose of this Act is unquestionably none other than to raise revenues for the municipalities. The tax is measured on the volume of business transacted in the preceding year, and if it is not paid, it is collected through regular channels, but it does not prevent the taxpayer from continuing to do business nor makes it unlawful.

In this case, as was said in the decision in *General Motors*, *supra* referring to the action of the State of Washington, the tax was not imposed by way of a license granting or denying to plaintiffs the privilege of engaging in an interstate commerce activity.

The fact alone that the Communications Act of 1934 by federal authority regulates plaintiffs' activities and services in Puerto Rico does not render them immune to the taxing power of the Commonwealth nor to its police power, although the latter is not in issue at this time, nor to any other governmental power of the Commonwealth the exercise of which is not clearly and irreconcilably in conflict with the federal authority exercised at the time the latter becomes operative. The controversies appertaining to the State's taxing power must be examined and decided on the basis of fundamentally practical considerations. This power is too valuable to the life of the State to have these controversies decided theoretically on the basis of doctrinal niceties. If anything, what the Justices' elaborate discussion in *De Lima* v. *Bidwell* and *Downes* v. *Bidwell* teaches is precisely that. We would be somewhat naive if we believed that the payment by plaintiffs of these relatively small amounts of license tax would defeat the purposes and aims of the Communications Act of 1934.

The Constitution provides in Art. VI, § 2, that the power of the Commonwealth of Puerto Rico to impose and collect taxes and to authorize their imposition and collection by municipalities shall be exercised as determined by the Legislative Assembly, and it shall never be surrendered or suspended. This Court cannot be inclined to surrender it easily, and it would render it void only when exercised in violation of the applicable provisions of the Constitution of the Commonwealth, or of the private rights guaranteed by the Constitution—no person shall be deprived of his liberty or property without due process of law, nor shall the equal protection of the law be denied to anyone—or if exercised in violation of the lawful and moral obligations which the people accepted in their Federal Relations. There is nothing in the License Tax Act of Puerto Rico nor in the collection of the tax challenged by plaintiffs to interfere, hinder, or defeat the federal authority exercised pursuant to the Communications Act of 1934.

From the point of view of the constitutional protection of the due process, it cannot be said either that the Commonwealth of Puerto Rico does not afford to plaintiffs anything in exchange for what it takes. *Memphis Gas Co.* v. *Stone*, 335 U.S. 80, 96.

In view of the foregoing considerations, the judgments on appeal will be reversed and the record remanded to the San Juan Part of the Superior Court in order that it may render other judgments affirming those of the San Juan Part of the District Court which dismissed the complaints for refund of license taxes.

Mr. Justice Blanco Lugo and Mr. Justice Ramírez Bages concur in the result.